# In re J-W-S-, Applicant

*Decided June 7, 2007*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) The evidence of record did not demonstrate that the Chinese Government has a national policy of requiring forced sterilization of a parent who returns with a second child born outside of China.

(2) Although some sanctions may be imposed pursuant to local family planning policies in China for the birth of a second child abroad, the applicant failed to provide evidence that such sanctions in Fujian Province or Changle City would rise to the level of persecution.

FOR APPLICANT: Kimberly Ellis, Esquire, New York, New York

FOR THE DEPARTMENT OF HOMELAND SECURITY: Carol Moore, Assistant Chief Counsel

BEFORE: Board Panel: FILPPU, COLE, and PAULEY, Board Members.

PAULEY, Board Member:

In a decision dated May 16, 2003, an Immigration Judge granted the applicant's request for asylum and withholding of deportation. On September 14, 2004, we sustained the appeal of the Department of Homeland Security ("DHS") and vacated the Immigration Judge's decision, finding that the applicant failed to establish eligibility for asylum, withholding of deportation, or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture"). We subsequently reissued that decision pursuant to an order dated August 30, 2005. This case is now before us on remand from the United States Court of Appeals for the Second Circuit, which vacated our decision in its January 11, 2006, order. Having further considered the case pursuant to the court's order, we will again sustain the DHS's appeal and order the applicant removed to China.

## I.  FACTUAL AND PROCEDURAL HISTORY

The applicant is a native and citizen of China who arrived in the United States in 1992 and married here in 1999.  He and his wife now have two United States citizen children born in 2000 and 2002.  The applicant contends that if he is returned to China, the Chinese Government will forcibly sterilize him or his wife for violating that country's one-child policy.  He also alleges that they will face fines and will have difficulty registering their children.  The applicant states that he and his wife would like to have more children but that they would not be permitted to do so in China.  Finally, he claims that he will be harmed because he violated China's exit laws.

In our previous decisions we found that the applicant failed to demonstrate that he has an objectively reasonable well-founded fear of sterilization on account of his opposition to China's one-child policy if he is removed to China.  We found that the evidence of record did not establish that there was a national policy regarding the application of the coercive population control policies to parents of foreign-born children.[1]  Taking into account the additional evidence submitted by the applicant with his appeal, we found that the sanctions or penalties that might be imposed on the applicant or his wife

---

[1]  The following documents relevant to the asylum application were admitted into evidence by the Immigration Judge:  (1) Application for Asylum and for Withholding of Removal (Form I-589); (2) household registration booklets of the applicant and his wife; (3) national ID cards of the applicant and his wife; (4) notarial birth certificates of the applicant and his wife; (5) the applicant's marriage certificate; (6) birth certificates of the applicant's two sons; (7) a family photograph; (8) an affidavit and curriculum vitae by John Shields Aird dated February 16, 2002; (9) Steven W. Mosher, *The Long Arm of 'One-Child' China*, Wash. Post, Apr. 10, 1988; (10) *Newsletter*, Association of Chinese Population Students in America (ASPSA), July 1988; (11) Lauren Martin, *Australia: Partner in China Abortion*, The Sydney Morning Herald, May 6, 1999 (obtained from the Foreign Broadcast Information Service ("FBIS")); (12) Transcript of "PM," June 16, 1999; (13) Penelope Green, *Amnesty tags China abortion*, The Australian, June 17, 1999; (14) Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *China Country Reports on Human Rights Practices–2002* (Mar. 31, 2003), *available at* http://www.state.gov/g/drl/rls/hrrpt/2002/18239.htm [hereinafter *2002 Country Reports*]; and (15)  Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *China: Profile of Asylum Claims and Country Conditions* (Apr. 14, 1998).

on return to China because of the births of their United States citizen children would not rise to the level of persecution.[2]

In its remand order, the court requests that we specifically address all of the evidence in the record and explain the basis for our conclusion that the applicant does not have "an objectively well-founded fear of sterilization on account of his opposition to China's one-child policy if he is removed to China." The court also asks that we address the applicant's claim in light of

---

[2] During the course of the DHS's initial appeal to the Board, the applicant submitted an updated affidavit by John Shields Aird dated January 28, 2004, and the following documents, in addition to several that had been previously submitted to the Immigration Judge, as noted above: (1) Guizhou Regulations on Family Planning (July 27, 1998) (translated by FBIS); (2) Guangdong Province Revised Family Planning Regulations (Oct. 18, 1998); (3) FBIS summary of the Anhui Provincial Regulations on Family Planning (June 16, 1999); (4) Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *China–Country Conditions and Comments on Asylum Applications* 35-37 (Dec. 11, 1995); (5) Changle City Family Planning Policy Leading Team, *Opinions in Administering the Family Planning Subjects with Early Marriage and Out of Plan Pregnancy* (June 27, 1995); (6) Administrative Decision of the Fujian Province Department of Family-Planning Administration (2003); (7) Administrative Opinion On Sanctions Against Family-Planning Violations of the Changle City Family-Planning Board (May 22, 2003); (8) Yu Jianrong, *The Evil Forces in Rural Areas and the Deterioration of Grassroots Administration–A Survey of the South Area of Hunan* (Sept. 3, 2001) (translated by FBIS); (9) Testimony of Josephine Guy, Director of Governmental Affairs, America 21, before the House Committee on International Relations (Oct. 17, 2001); (10) PRI Weekly News Briefing (Oct. 26, 2001); (11) Letter from Retired Ambassador William A. Brown, Ms. Bonnie L. Glick, and Dr. Theodore G. Tong to the Honorable Colin L. Powell, Secretary of State (May 29, 2002); (12) Juliet Eilperin, *U.S. Withholds $34 Million in Family Planning Funding to UN*, Wash. Post, July 23, 2002; (13) *Beijing Mayor Speaks on Family Planning Policy*, Beijing Ribeo, Aug. 23, 1989 (obtained from FBIS); (14) Owen Brown, *China Blasts Court Ruling on One Child Policy*, AAP Newsfeed, June 22, 1998; (15) *Lin v. INS*, No. 01-4113, 2003 WL 22454477 (2d Cir. Oct. 29, 2003) (summary order); (16) PRC Law of Population and Family Planning (adopted by the 25th meeting of the Standing Comm., Ninth Nat'l People's Cong., Dec. 29, 2001) (translated by FBIS); (17) China's State Council document on Family Planning, Xinhua New China News Agency, May 7, 2000; and (18) Report by Qin Jie, Beijing Xinhua Domestic Service, *Hu Jintao Addresses Major National Forum on Population, Resources, and Environment*, Mar. 9, 2003 (translated by FBIS).

*Huang v. U.S. INS*, 421 F.3d 125 (2d Cir. 2005).[3] Both parties have submitted briefs and additional documents on remand.[4] After further reviewing the documents of record, we find that the applicant has not demonstrated that he has a well-founded fear of persecution if removed to China.

## II.  ANALYSIS

As an initial matter, we note that the applicant does not claim to have suffered past persecution in China.  Rather, his claim is based solely on a fear of future persecution because of the birth of his United States citizen children, his desire to have more children, and his illegal departure from China. Assuming that the applicant has a subjective fear of returning to China, the question is whether he has met his burden of demonstrating an objectively reasonable fear of persecution on account of one of the grounds enumerated in the Immigration and Nationality Act.  *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987).

---

[3]  In *Huang v. U.S. INS*, *supra*, the Second Circuit held that an asylum applicant failed to establish that he had a well-founded fear of forced sterilization or other harm amounting to persecution under China's coercive population control program based on the fact that he fathered two children in the United States.

[4]  Pursuant to the court's order, the DHS submitted for consideration on remand a compilation of documents entitled "Government's Submission of Evidence for Speculative PRC Family Planning Claims Arising out of the Birth of Children in the United States." These documents include: (1) INS Resource Information Center, *Chinese State Birth Planning in the 1990s and Beyond*, Perspective Series, PS/CHN/01.001(Wash. D.C., Sept. 2001); (2) INS Resource Information Center, *Treatment of returning peasants and workers who violated the one-child family planning policy while abroad*, Query Series (Wash. D.C., June 13, 2002); (3) Country Information and Policy Unit, UK Immigration and Nationality Directorate, *China Country Assessment* (Apr. 2002); (4) Letter from Constance A. Johnson, Senior Legal Research Analyst, The Library of Congress, to Randa Zagzoug,  INS Office of the Deputy District Counsel (May 14, 2001), and accompanying documents; (5) Philip P. Pan, *China's One-Child Policy Now a Double Standard–Limits and Penalties Applied Unevenly*, Wash. Post, Aug. 20, 2002; (6) H.R. Rep. No. 104-469(I) (1996); (7) *Chen v. INS*, 195 F.3d 198 (4th Cir. 1999); and (8) Research Directorate, Immigration and Refugee Board of Canada, REFINFO Series, CHN37335.E (Ottawa, Apr. 19, 2002) (regarding PRC exit visas).  The applicant has submitted the 2005 Department of State country report with his brief on remand.  Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *China Country Reports on Human Rights Practices–2005* (Mar. 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61605.htm [hereinafter *2005 Country Reports*].

Both parties have submitted numerous documents generally describing China's family planning program, including the national "one-child" policy and the delegation of enforcement to the provincial and local authorities. We also consider and take administrative notice of recent reports issued by the United States Department of State. *See Yang v. McElroy*, 277 F.3d 158, 163 n.4 (2d Cir. 2002). These documents indicate wide variation in the manner and strictness with which the "one-child" policy is enforced in the various provinces.[5] Although the applicant's asylum application indicates that he resided in Fujian Province, Changle City, the applicant has not argued in his brief that the "one-child" policy is more strictly enforced in this province or locality than in other areas of China, or that he would necessarily have to return to Fujian Province. Rather, he presents a generalized argument that he would be considered to have violated the "one-child" policy and would be subjected to sterilization or other harm amounting to persecution were he to be returned to China.

The applicant relies on affidavits by demographer John Shields Aird from 2002 and 2004, which take issue with the assessments in the State Department's documents regarding the application of China's family planning policies to returning parents of foreign-born children. As we observed in *Matter of C-C-*, 23 I&N Dec. 899 (BIA 2006), the Aird affidavits are not based on personal knowledge of conditions in China, but rather on a review of documents concerning events and practices in that country. In that regard, the affidavits provide only generalized statements that Chinese citizens who entered the United States illegally would be subject to the same punishments that apply to Chinese couples who violate the family planning laws in China. The affidavits refer to an incident in 1988 when a Chinese couple living abroad asked for permission to give birth to a second child and was told by family planning officials that their unauthorized child could jeopardize their factory's plans for expansion and result in punishment to the workforce. *See*

---

[5] Although in general China's family planning policy has been termed a "one child" policy, in practice it is apparent that deviations from the general rule of "one child" persist. *See 2005 Country Reports*, *supra*. In general, China's 2002 National Population and Birth Planning Law allows married couples to have one child as a matter of right and permits many couples to have a second within certain time frames. *See* Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *China: Profile of Asylum Claims and Country Conditions* 24 (May 2007); *see also* Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *China: Profile of Asylum Claims and Country Conditions* 21 (Oct. 2005). Deviations in implementing this law occur at the provincial, or even village, level. *See 2007 Profile*, *supra*, at 23. The *2007 Profile* specifically states that the "implementation of birth planning policy in villages . . . is the responsibility of local officials." *Id.*

*The Long Arm of 'One-Child' China*, *supra* note 1 (included as an attachment to both of the Aird affidavits). The affidavits and accompanying documents, however, refer to no incidents of forced sterilization of parents who return to China with children born abroad.

In regard to the punishments imposed for violation of population control policy, the country report from 2006 states the following:

> Those who violated the child limit policy by having an unapproved child or helping another to do so faced disciplinary measures such as job loss or demotion, loss of promotion opportunity, expulsion from the party (membership in which was an unofficial requirement for certain jobs), and other administrative punishments, including in some cases the destruction of property. In the case of families that already had two children, one parent was often pressured to undergo sterilization. These penalties sometimes left women with little practical choice but to undergo abortion or sterilization. There were several rewards for couples who adhered to birth limitation laws and policies, including monthly stipends and preferential medical and educational benefits.

Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *China Country Reports on Human Rights Practices–2006* (Mar. 6, 2007), *available at* http://www.state.gov/g/drl/rls/hrrpt/2006/78771.htm [hereinafter *2006 Country Reports*]. The Chinese Government as a whole clearly achieves compliance with birth limits using both incentives and pressure. At issue is whether an alien can prove that he or she personally faces a well-founded fear of persecution–generally, forced abortion or sterilization. "Pressure" to undergo abortion or sterilization may not necessarily mean physical or mental *coercion* in the above context of economic rewards and benefits. While we recognize that there have been isolated reports of forced sterilization in the documents of record, such occasional incidents do not indicate that the applicant would be singled out for this treatment upon his return to China. Nor do they demonstrate a pattern or practice of persecution that would provide the applicant a basis for a well-founded fear of persecution in China on account of the birth of two children in the United States while he was outside of China for nearly 15 years. 8 C.F.R. § 1208.13(b)(2)(iii)(A) (2007).

The most recent State Department document examining Chinese country conditions as to coercive population planning policies indicates that by national regulation, children born overseas are "not . . . counted" for birth planning purposes when the parents return to China. Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *China: Profile of Asylum Claims and Country Conditions* 30 (May 2007) [hereinafter *2007 Profile*]. In fact, the *2007 Profile* states that "a person born in the United States to Chinese parents who enters China on a U.S. passport . . . will be regarded as

a U.S. citizen." *Id.* Contrary to the applicant's contention, the *Profile* from 2005 confirms that American diplomats in China are unaware of "any cases in which returnees from the United States were forced to undergo sterilization procedures on their return." Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *China: Profile of Asylum Claims and Country Conditions* 28 (Oct. 2005) [hereinafter *2005 Profile*]. This conclusion is consistent with reports on China's population control policy from other governments.[6]

The evidence of record suggests that if a returnee who has had a second child while outside of China is penalized at all upon return, the sanctions would be fines or other economic penalties. Enforcement efforts resulting in moderate economic impact would not, in general, prove a well-founded fear of future persecution. *See Matter of T-Z-*, 24 I&N Dec. 163 (BIA 2007); *Matter of Y-T-L-*, 23 I&N Dec. 601, 606 (BIA 2003). For example, the *2007 Profile* states that "sanctions and economic penalties" levied on parents of children born abroad could include increased costs for education and other social benefits, which would not be provided free to children who are not Chinese nationals. *2007 Profile*, *supra*, at 30. Also, the September 2001 INS Resource Information Center ("RIC") report, *Chinese State Birth Planning in the 1990s and Beyond*, provides that overseas Chinese are largely exempt from the coercive population control policies and can return to China with a pregnancy or a child born abroad without being penalized. *See supra* note 4. Additionally, the June 2002 RIC article, *Treatment of returning peasants and workers who violated the one-child family planning policy while abroad*, provides that "in general, the use of fines rather than more extreme punitive measure seems to be the norm in China [for returning workers and peasants]." *See supra* note 4. In that regard, the June 22, 1998, article entitled *China Blasts Court Ruling on One Child Policy* indicates that the Chinese Government denies charges that Chinese citizens and nationals who return home with foreign born children are persecuted. *See supra* note 2. Moreover, the article further notes that two-thirds of Chinese women have two or more children.

---

[6] A recent report from Canada does not refer to any instances of forced sterilizations of Chinese citizens who were returning to China with a child who had been born abroad. *See* Research Directorate, Immigration and Refugee Board of Canada, *China: Penalties faced by couples returning from overseas who are in violation of family planning regulations (2001-2005)* (Ottawa, Aug. 25, 2005), http://www.irb-cisr.gc.ca/en/research/rir/index_e.htm?action=record.viewrec&gotorec=4 49481. We have authority to take administrative notice of this report. *See* 8 C.F.R. § 1003.1(d)(3)(iv) (2007); *see also Yang v. McElroy*, 277 F.3d 158, 163 n.4 (2d Cir. 2002).

Having considered all of the relevant evidence, we find that the State Department reports are more persuasive than the Aird affidavit in determining the chances that the applicant will be sterilized if he returns to China. *See Wang v. BIA*, 437 F.3d 270, 276 (2d Cir. 2006) (noting that "a balancing of the 2004 Country Report against the Aird affidavit's criticism of that report . . . would lead to the conclusion . . . that [the alien] has not shown he would face anything more than economic sanctions if returned to China"). We therefore find that the evidence of record does not demonstrate that the Chinese Government has a national policy of requiring forced sterilization of parents who return with a second child born outside of China.

Although the applicant has not argued that he would be subjected to a stricter family planning regime in Fujian Province than that which is generally applied in China, we will separately consider the documents in the record that discuss enforcement in Fujian Province and Changle City. *See Shou Yung Guo v. Gonzales*, 463 F.3d 109 (2d Cir. 2006) (remanding for consideration of documents regarding family planning enforcement efforts in Fujian Province). Two of the documents referred to in *Shou Yung Guo* were included as attachments to the 2004 Aird affidavit submitted by the applicant: (1) a 2003 Administrative Decision from the Fujian Province Department of Family-Planning Administration and (2) a May 22, 2003, Administrative Opinion On Sanctions Against Family-Planning Violations from the Changle City Family-Planning Board. *See supra* note 2. These documents respond to an inquiry by a government employer in regard to the appropriate sanctions to be applied to an employee whose spouse had given birth to a second child while visiting in the United States. Both documents conclude that the employee in question and his spouse violated the family planning law and recommend that proper sanctions be considered in compliance with provincial regulations, as well as regulations specific to Communist Party members and state employees. Neither document refers to sterilization, much less forced sterilization.

A third document attached to the 2004 Aird Affidavit, which is dated June 27, 1995, and provides opinions on out-of-plan pregnancy of the Changle City Family Planning Policy Leading Team, states that "subjects" who give "out-of-plan birth . . . must be imposed with sterilization operation."[7] *See supra* note 2. However, assuming this policy remains in place, the applicant has not provided evidence that it is implemented through physical force or other means that would amount to persecution. Policies in

---

[7] Although not included in this record, a July 1999 *Q&A for Changle City Family-Planning Information Handbook*, which is referenced in *Shou Yung Guo v. Gonzales*, *supra*, at 113, also states that sterilization is mandatory following the birth of a second child.

many countries, even those enacted into law, remain unenforced for lack of resources or political will. Moreover, central government policy prohibits physical coercion to compel persons to submit to family planning enforcement.[8]

The most recent State Department *Profile* also undermines the applicant's argument that Fujian Province is particularly likely to harshly punish returning Chinese citizens accompanied by "unauthorized" children born overseas. The *2007 Profile* states the following:

> As to Fujian Province, in response to an inquiry by the U.S. Consulate General in Guangzhou, the Population and Family Planning Commission of Fujian Province stated in an October 2006 letter that children born abroad, if not registered as permanent residents of China (i.e., not entered into the parents' household registration), are not considered as permanent residents of China, and therefore are not counted against the number of children allowed under China's family planning laws.

*2007 Profile*, *supra*, at 30 (referencing a letter attached as Appendix C).

Enforcement efforts in Fujian Province, in particular, have in the past been described as "lax" or "uneven" in published reports and court decisions. *See, e.g.*, Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *China: Profile of Asylum Claims and Country Conditions* 20, 25 (Apr. 14, 1998). Similarly, the *2005 Profile* describes a "wide variation" in Fujian

---

[8] The *2002 Country Reports*, *supra*, state the following in regard to that policy:

> Central government policy formally prohibits the use of physical coercion to compel persons to submit to abortion or sterilization. However, intense pressure to meet birth limitation targets set by government regulations has resulted in instances in which local birth planning officials reportedly have used physical coercion to meet government goals. Because it is illegal, the use of physical coercion was difficult to document, even for government authorities. Still, it was believed that some isolated incidences may persist, even as the frequency of such cases was believed to be declining. One documented case in 2000 resulted in the arrest and punishment of the involved officials.

The report further notes that "[s]enior officials stated repeatedly that the Government 'made it a principle to ban coercion at any level,' and the SFPC [State Family Planning Commission] has issued circulars nationwide prohibiting birth planning officials from coercing women to undergo abortions or sterilization against their will." *Id.*; *see also 2006 Country Reports*, *supra*.

Province with regard to "social compensation fees" for "out-of-plan" births.[9] *2005 Profile*, *supra*, at 25. Of course, we acknowledge "reports" of forced sterilizations of women in that province as documented in the *2006 Country Reports*, *supra*, but note that physical coercion continues to be officially condemned. Indeed, in 2006, State Department interviews with visa applicants from Fujian Province yielded "no evidence" of forced abortions. *2007 Profile*, *supra*, at 27. The 2002 United Kingdom Immigration and Nationality Directorate report, *China Country Assessment*, also concludes that Fujian Province is generally lax in implementing population control policies. *See supra* note 4; *see also Huang v. U.S. INS*, *supra*, at 128 (concluding from the evidence that Fujian Province had a relatively lax family-planning policy, particularly when the first child was a daughter). Although the applicant in this case had two sons within 2 years and the first child of the applicant in *Huang* was a daughter born more than 4 years prior to the second child, these differences do not provide an objective basis for finding that the applicant has demonstrated a well-founded fear of persecution. The court in *Huang* ultimately approved our finding that "'couples returning to China with more children than they would have been permitted at home are 'at worst, given modest fines,'" when that conclusion was not contradicted by other evidence presented by the applicant. *Huang v. U.S. INS*, *supra*, at 129.

Upon review of all of the evidence contained in the record of proceeding, we find that there is insufficient evidence to indicate that the applicant has an objectively reasonable well-founded fear of sterilization on account of his opposition to China's one-child policy if he is removed to China. *INS v. Cardoza-Fonseca*, *supra*; *Huang v. U.S. INS*, *supra*, at 129 ("In the absence of solid support in the record for [an applicant's] assertion that he will be subjected to forced sterilization, his fear is speculative at best."). At most, the evidence contained in the record of proceedings suggests that the applicant and his wife may face "sanctions and penalties" upon returning to China because of the births of their United States citizen children. The evidence, however, fails to establish that any sanctions imposed on parents of foreign-born children would rise to the level of persecution. *Id.* Whether the applicant and his wife will have other children in China is merely speculative at this point.

With regard to the issue of the applicant's illegal departure from China, we note that he has not raised this issue in his brief on remand from the Second Circuit. In any case, we agree with the Immigration Judge's findings

---

[9] In fact, the *2005 Profile* details examples of fines imposed in Fujian Province on couples with four or five children. By its nature, this evidence tends to undermine the applicant's claim that his fear of sterilization after having two children is well founded.

that the applicant does not face persecution on account of one of the grounds enumerated in the Act based on his illegal departure from China. *See Matter of Sibrun*, 18 I&N Dec. 354, 359 (BIA 1983). The most recent evidence in the record addressing this issue provides that "[p]ersons who were trafficked from the country and then repatriated sometimes faced fines for illegal immigration upon their return; after a second repatriation, such persons could be sentenced to a term in a reeducation-through-labor camp." Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *China Country Reports on Human Rights Practices–2002* (Mar. 31, 2003), *available at* http://www.state.gov/g/drl/rls/hrrpt/2002/18239.htm. Since the applicant has not illegally departed China more than once, the evidence suggests that he may face a fine for departing without permission upon return. *Accord 2007 Profile*, *supra*, at 31. A fine for illegal departure would not amount to persecution under the Act or torture as envisioned by the Convention Against Torture. 8 C.F.R. § 1208.16 (2007).

## III.  CONCLUSION

In sum, we find that the applicant has failed to meet his burden of proving eligibility for asylum, withholding of deportation, or protection under the Convention Against Torture. Accordingly, the DHS's appeal will be sustained, the decision of the Immigration Judge will be vacated, and the applicant will be ordered deported to China.

**ORDER:** The appeal of the Department of Homeland Security is sustained.

**FURTHER ORDER:** The decision of the Immigration Judge is reversed.

**FURTHER ORDER:** The applicant is ordered deported to China.