NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 08-4584

_____

XU HANG ZHANG; PING MEI LIN,

Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

_____

On Petition for Review of a Final Order
of the Board of Immigration Appeals
Immigration Judge: Honorable Frederic G. Leeds
(Nos. A099-686-987/8)

_____

Submitted Under Third Circuit LAR 34.1(a)
June 3, 2010

_____

Before: AMBRO, CHAGARES, and VAN ANTWERPEN, <u>Circuit Judges</u>

(Opinion filed: July 22, 2010)

_____

OPINION

_____

AMBRO, <u>Circuit Judge</u>

Xu Hang Zhang and Ping Mei Lin seek review of the final order of the Board of

Immigration Appeals ("BIA") denying their request for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").[1] For the reasons that follow, we grant their petition for review in part, deny it in part, and remand the case for further proceedings consistent with this opinion.

## I.

Zhang and Lin are a husband and wife from the People's Republic of China. Both entered the United States without a visa—Lin in December 2005[2] and Zhang (with the couple's son) in January 2006. Zhang then filed an asylum application with United States Citizenship and Immigration Services ("CIS"). CIS denied Zhang's application, finding that his "testimony was not credible in material respects, . . . [and that he] failed to meet the burden of establishing . . . refugee [status under] 8 C.F.R. § 208.13." (A.R. 170.) Zhang conceded removability and re-filed an application for asylum, withholding of removal, and CAT protection.

Zhang's amended application alleged that he and his wife were persecuted while in China. In particular, he highlighted three incidents, two involving the underground Catholic Church and one involving a forced abortion. The first church-related incident allegedly took place in May 2003, when a secret church gathering was discovered by

_____

[1] Lin is a derivative beneficiary of Zhang's applications for asylum, withholding of removal, and CAT protection.

[2] There are inconsistencies regarding the date Lin entered the United States. In some instances the record notes she arrived in December 2004 and in others the date is December 2005.

2

local cadres. Everyone escaped except Zhang, who was detained for 24 hours and abused by the cadres. In order to be released, Zhang promised to quit the underground church; however, he broke this promise shortly thereafter. The second church-related incident allegedly occurred in November 2004, when Zhang decided to house a priest and organize a Mass in his home. The cadres learned of this and set out to arrest him again; however, Zhang and his wife were tipped off and fled to a family member's home for safety. They then left the country.

Between these two incidents, Lin was allegedly forced to have an abortion. Following the birth of her first child, Chinese authorities inserted an IUD. The IUD fell out, however, and Lin became pregnant. After hiding from the authorities and skipping her periodic gynecological examinations for seven months, Lin was found by local cadres, dragged to a hospital, and forced to have an abortion.

In addition to these allegations of past persecution, the couple also fears future persecution based on the recent birth of their second child, who was born in the United States. They allege that this birth is a violation of China's Family Planning Policy, and that they will be persecuted upon their return to China.

Following a hearing in April 2007, the Immigration Judge denied the petitioners all relief. First, he concluded that "at this time . . . the [petitioners] as a *matter of law* [could not] pursue [the] theory [that the birth of a second child in the United States would constitute a violation of China's Family Planning Policy]." (A.R. 69 (emphasis added).) He also found that Zhang was not credible. This adverse credibility finding was based on

various inconsistencies in Zhang's testimony, including: (1) the number of people arrested in the May 2003 incident; (2) the number of cadres involved in Zhang's arrest; (3) the extent of the petitioners' involvement with the underground church in China; (4) a priest's failure to corroborate either of the petitioners' church-related incidents of persecution in a letter to the IJ; and (5) contradictory dates given for the November 2004 incident. Finally, the IJ dismissed the forced abortion claim because his adverse credibility determination as to the church-related incidents "raise[d] questions [about] the testimony on the family planning matter" as well. (A.R. 71.)

The petitioners filed a notice of appeal. In October 2008 the BIA affirmed, holding that the adverse credibility determination was not clearly erroneous and that they "agree[d] with the [IJ's] decision that the [petitioners were] not eligible for relief based on the birth of children in the United States." (A.R. 2.) Zhang then filed a timely petition for review by us.

## II.

We have jurisdiction under 8 U.S.C. § 1252 to review a final order of removal issued by the BIA. *Sandie v. Att'y Gen.*, 562 F.3d 246, 250 (3d Cir. 2009). "[W]hen the BIA both adopts the findings of the IJ and discusses some of the bases for the IJ's decision, we have authority to review the decisions of both the IJ and the BIA." *Chen v. Ashcroft*, 376 F.3d 215, 222 (3d Cir. 2004). "We review the BIA's legal decisions de novo . . . ." *Toussaint v. Att'y Gen.*, 455 F.3d 409, 413 (3d Cir. 2006) (internal quotation marks omitted). When an erroneous legal standard is applied, "a remand is . . . required

4

to permit application of the appropriate legal standard." *Rapanos v. United States*, 547 U.S. 715, 786 (2006) (Kennedy, J., concurring) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)); *see Konan v. Att'y Gen*, 432 F.3d 497, 501 (3d Cir. 2005) (stating that when a "claim was never considered [by the IJ or BIA,] the case must be remanded"). Factual findings, including findings of adverse credibility, are subject to the substantial evidence standard. *Sandie*, 562 F.3d at 251. "Under this deferential standard, 'findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)).

III.

In their petition for review, the petitioners challenge the IJ's adverse credibility determination, as well as the IJ's (and BIA's) dismissal of their U.S.-birth claim.[3] We grant their petition for review in part and deny it in part. While we reject the petitioners' challenge to the IJ's adverse credibility finding because it was supported by substantial evidence, we reject as well the IJ's (and BIA's) conclusion that the petitioners are barred as a matter of law from arguing that they will be persecuted under China's Family Planning Policy for having a second child while in the United States. This legal error requires us to remand this case to the IJ for further review of the evidence regarding the petitioners' U.S.-birth claim.

---

[3] Although the Government alleges that the petitioners have not challenged the dismissal of their U.S.-birth claim (Gov't Br. at 9 n.4), the petitioners did raise it in their brief before the BIA (A.R. 11-12, 19), as well as in their brief before us (Pet'r Br. at 18-19). In addition, the BIA expressly affirmed the IJ's decision on these grounds. (A.R. 2.) Therefore, we may consider the petitioners' U.S.-birth claim here.

A.

We turn first to the IJ's adverse credibility determination. To reverse such a finding, "the evidence of credibility must be so strong . . . that in a civil trial [the alien] would be entitled to judgment on the credibility issue as a matter of law." *Chen*, 376 F.3d at 222. After the REAL ID Act of 2005, credibility determinations must be made "[c]onsidering the totality of the circumstances," and may be based on "the inherent plausibility of the applicant's . . . account, the consistency between the applicant's . . . written and oral statements . . . , the consistency of such statements with other evidence of record . . . , and any inaccuracies or falsehoods in such statements." 8 U.S.C. § 1158(b)(1)(B)(iii). The trier of fact may make the assessment "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor." *Id.* We may only overturn an adverse credibility determination if we conclude that "any reasonable adjudicator would be *compelled* to conclude to the contrary." *Id.* § 1252(b)(4)(B) (emphasis added).

The IJ offered numerous reasons as to why Zhang lacked credibility. He noted, in particular, that: (1) Zhang's written and oral statements about the number of people arrested in the May 2003 incident were inconsistent; (2) the number of cadres involved in Zhang's arrest (during the May 2003 incident) changed from two to three from his written statement to his oral testimony; (3) Zhang's oral testimony about his church activities was confused and incoherent; (4) the affidavit from the petitioners' priest in China (which was supposed to corroborate their stories) failed to offer any information about either church-

6

related incident; and (5) Zhang provided different dates for the November 2004 incident in his written and oral statements. Collectively, these inconsistencies provide substantial evidence to affirm the IJ's (and BIA's) decision. We outline each.

Turning first to the May 2003 incident, the IJ began his analysis by discussing the issue of how many church members were arrested. Zhang's application stated that "the village cadres arrived on the scene . . . and proceeded to arrest us," but during the hearing Zhang testified that only he was arrested. (A.R. 127-28, 467.) Although Zhang offered a plausible explanation for this apparent inconsistency, the IJ rejected it.

In addition, the IJ noted that Zhang confused the number of cadres that arrested him. In Zhang's written statement, he said, "I was uncertain who pushed me[,] but I fell to the ground. After getting back on my feet two village cadres were before me and firmly grabbed me. The village cadres arrested me and placed me in detention . . . ." (A.R. 467.) At the hearing, the IJ asked Zhang how many cadres came into the church, to which he replied "[t]hree of them" (A.R. 126); later, when asked whether three grabbed him and brought him in, Zhang hesitated and then said "correct." (A.R. 129.) When asked to clarify this inconsistency, Zhang explained that "[t]wo of them apprehend[ed] me, yes, but when we [were] leaving there, it was three." (A.R. 150.) The IJ did not accept this explanation.

The third inconsistency in Zhang's testimony concerned his overall involvement in the underground Catholic Church. This particular portion of Zhang's testimony was

7

virtually incomprehensible; however, we have derived the following basic facts.[4] Zhang

and his wife actively participated in an underground church community, which generally

congregated in private homes and was unofficially named "Lianjiang." Their

participation in this group is what led to their alleged persecution and Zhang's arrest. The

couple also on rare occasions went to a formal underground church named "Yangwei

Village Church." This church maintained a physical building and is where Zhang and Lin

were married.[5] The IJ concluded that the overall level of confusion in this part of Zhang's

testimony undermined his credibility.[6]

The final two inconsistencies discussed in the IJ's opinion were related to the

November 2004 incident. To repeat, this incident followed Zhang's decision to provide

refuge to a priest in his home, after which the petitioners were forced to flee their village

(and, later, the country itself). Turning first to a simple inconsistency, the IJ noted that

---

[4] We note that Zhang mixes the Mandarin and Foo Chow dialects. This might have contributed to some of the confusion during his testimony.

[5] In reviewing Zhang's testimony, it is possible that he did not understand what the IJ meant by "church involvement." For instance, at the hearing, Zhang described his community's religious gatherings in some detail, while at the same time insisting that there was no church in his village. However, even as Zhang struggled with the IJ's church-related questions, his wife (Lin) had little trouble following a similar line of questioning.

[6] The transcript from the IJ's oral decision mentions two churches that were not otherwise mentioned in the administrative record—"Yung Village Church" and "Yang Yi Village Church." The IJ also refers to "Lianjiang Catholic Church," which was discussed during the petitioners' hearing. This confusion may have been the product of linguistic difficulties, transcription errors, or both. It is nonetheless not fatal to the IJ's adverse credibility determination, which is supported by substantial evidence.

Zhang offered contradictory dates for this incident in his written statement and oral testimony. In Zhang's written statement, the second church-related incident was dated April 2005; however, in his oral testimony, he claimed that the same event took place in November 2004. At the hearing, Zhang could not provide an explanation for this inconsistency.

The final inconsistency involved a letter from a Chinese priest that was submitted by the petitioners. Based on Zhang's testimony, the IJ assumed that this letter was from the priest involved in the November 2004 incident. After reviewing the record, we are not certain that this is the case, although it was reasonable for the IJ to conclude as much. Regardless whether it was the same priest or just another local clergyman, the letter failed to mention either the May 2003 arrest (which the priest knew about, according to Zhang's testimony) or the November 2004 incident (in which the priest may have been involved).[7] Instead of discussing these incidents, the priest mentioned the general persecution of

---

[7] At the hearing, the IJ asked whether "the priest that issued you this certificate . . . kn[e]w that you were arrested in May of 2003." (A.R. 144.) Zhang replied, "Yes, he knew . . . ." (A.R. 144.) The IJ followed up by asking, "Did you know that the priest doesn't make any mention of that at all in his letter?" (A.R. 144.) Zhang simply replied with a question, "He didn't write that?" (A.R. 144.) Zhang offered no further explanation for the priest's omission.

In addition, when the IJ explored Zhang's account of the November 2004 incident, the IJ asked whether Zhang provided an affidavit from a friend, his uncle, or the priest. Zhang responded that the "[p]riest issue[d] a certificate." (A.R. 146-47.) We take this response as referring to the same priest letter noted above, as it appears to be the only affidavit provided by a priest in this case. Interestingly, there is no mention of the November 2004 incident in that letter. At the hearing, the IJ asked, "Are you aware that this certificate issued by the priest makes no mention of th[e] [November 2004] incident?" (A.R. 147.) Zhang answered, "Huh? I did not know." (A.R. 147.)

Catholics in China, touching on how "religious freedom . . . is limited," "nuns [were] dangerous[ly] . . . pursu[ed]," "churches [were] . . . destroyed," and "priests were arrested." (A.R. 543.)

In the end, there is little doubt that this case presents at least borderline inconsistencies. Were we reviewing the IJ's findings *de novo*, we might have reached different conclusions about some of these inconsistencies. Nevertheless, the sheer number of inconsistencies (including a few that go to the heart of the petitioners' claims) support the IJ's adverse credibility determination. Furthermore, applying the deferential substantial evidence standard, we cannot conclude that we are compelled to overturn the IJ's finding.

### B.

Turning to the petitioners' U.S.-birth claim, the IJ held that "as a *matter of law . . .* the concept of having a second child in the United States at this time in the Third Circuit . . . is not a recognized legal theory." (A.R. 68 (emphasis added).)[8] The BIA agreed, concluding that the petitioners were "not eligible for relief based on the birth of children in the United States." (A.R. 2.) In so holding, the IJ relied on *Matter of C-C-*, 23 I. & N. Dec. 899 (BIA 2006), and our not precedential opinion in *Qiu v. Attorney General.*, 224 F. App'x 156 (3d Cir. 2007).[9] We conclude that both the IJ and BIA misread controlling

---

[8] Nevertheless, the IJ conceded that "the law is fluid in this area and it may change . . . if the respondent were to take an appeal of my decision." (A.R. 68.)

[9] The BIA also cited *Matter of J-W-S-*, 24 I. & N. Dec. 185 (BIA 2007). There, the petitioner left China, married, and fathered two children while in the United States. Later,

10

precedent in this area.

We have never held that a Chinese petitioner is precluded, as a matter of law, from arguing a fear of future persecution based on the birth of a child while in the United States. Instead, we have provided the same case-by-case analysis in the U.S.-birth context as we have when addressing other persecution claims. As such, even in cases where past persecution has not been established (as in the current case), an alien can still demonstrate a well-founded fear of future persecution by showing that he has a "genuine fear," and that a "reasonable person in [his] circumstances would fear persecution if returned to [his] native country." *Abdulrahman v. Ashcroft*, 330 F.3d 587, 592 (3d Cir. 2003) (internal quotation marks omitted).

Following this approach, a Chinese alien with two or more children (whether born in the United States or elsewhere) may qualify as a refugee if the evidence presented establishes: (1) that the births violate local family planning policies; and (2) that local

---

he argued that, if forced to return to China, he would be persecuted for both violating China's Family Planning Policy and departing illegally. The BIA rejected the petitioner's arguments and denied him relief. Nevertheless, it did not foreclose U.S.-birth claims as a matter of law. Instead, the BIA made a case-specific determination, based on the evidence presented by the petitioner. Indeed, *Matter of J-W-S-* was decided following a remand order from the Second Circuit. This order directed the BIA "specifically [to] address all of the evidence in the record and explain the basis for [its] conclusion that the applicant does not have an objectively well-founded fear of sterilization on account of his opposition to China's one-child policy if he is removed to China." *Id.* at 187 (internal quotation marks omitted). Following the Second Circuit's instructions, the BIA concluded as follows: "Having considered *all* of the relevant evidence, we find that the State Department reports are more persuasive than the [evidence offered by the petitioner] in determining the chances that the applicant will be sterilized if he returns to China." *Id.* at 192 (emphasis added).

11

enforcement of the policies is done through acts that amount to persecution. *See, e.g.,* *Matter of J-H-S-*, 24 I. & N. Dec. 196, 197-98 (BIA 2007) (concluding that "an alien who has established that he or she has had two children in China may qualify as a refugee if the evidence presented establishes, on a case-by-case basis, that the births violated family planning policies in that alien's local province . . . and that . . . local family planning enforcement . . . would give rise to a well-founded fear of persecution because of the violation"); *see also Matter of S-Y-G-*, 24 I. & N. Dec. 247, 251 (BIA 2007) (determining that, even when the second child was born in the United States, the two-prong rule in *Matter of J-H-S-* remains the guiding authority).

The Second Circuit Court considered a similar question in *Guo v. Gonzales*, 463 F.3d 109 (2d Cir. 2006). There, the petitioner applied for asylum and withholding of removal on the basis that she would be forcibly sterilized as a result of violating China's Family Planning Policy. The petitioner allegedly had three children; one born in China, one adopted in China, and a third born in the United States. However, because of significant inconsistencies in her airport interview, asylum application, and hearing testimony, the IJ determined that Guo was not credible, and her application for relief was denied. Years later, she filed a motion to reopen to apply for CAT relief, which the BIA rejected. She again filed a motion to reopen, this time based on changed country conditions. The BIA rejected this claim as well. Following her petition for review, the Second Circuit Court remanded for further consideration of the evidence, concluding "that IJs and the BIA have a duty to explicitly consider any country conditions evidence

12

submitted by an applicant that materially bears on his [or her] claim." *Id*. at 115 (internal quotation marks omitted).[10]

The IJ reads too much into *Qiu* and *Matter of C-C-,* and does not adequately address the record evidence offered by the petitioners. First, *Qiu* is a not precedential opinion, so it is not binding authority.[11] Second, *Matter of C-C-* did not establish an ironclad rule against U.S.-birth claims.[12] Instead, it merely held that an alien seeking to reopen removal proceedings cannot establish asylum eligibility by showing that she gave birth to two children and offering otherwise unpersuasive evidence. *See Matter of C-C-*, 23 I. & N. at 903 ("Having considered all of the relevant evidence, we find that the State Department reports are more persuasive than the Aird affidavit in determining the

---

[10] Also relevant to our case is that the Court added that "'an applicant may prevail on a theory of future persecution despite an IJ's adverse credibility ruling as to past persecution, *so long as the factual predicate of the applicant's claim of future persecution is independent of the testimony that the IJ found not to be credible*.'" *Id*. at 114 (quoting *Paul v. Gonzales*, 444 F.3d 148, 154 (2d Cir. 2006) (emphasis in original)); *see also Guo v. Ashcroft*, 386 F.3d 556, 562-63 (3d Cir. 2004) (stating that "[t]he legitimacy of an initial credibility determination does not . . . justify denial of all subsequent applications for asylum" and, furthermore, an "adverse credibility [determination is disconnected] from China's family planning policy"). Accordingly, the adverse credibility determination here is not necessarily fatal to the petitioners' claims.

[11] The IJ nonetheless described *Qiu* as "[t]he leading case." (A.R. 68.)

[12] The Government's citation to *Yu v. Attorney General*, 513 F.3d 346, 348-49 (3d Cir. 2007), is similarly unavailing, as *Yu* represents nothing more than a case-specific determination that the petitioners did not present sufficient evidence "to establish that there was a national . . . policy of sterilizing returning Chinese citizens who have more than one child." *Id*. at 347 (internal quotation marks omitted). Furthermore, we concluded that the BIA's determination was "supported by substantial evidence," as its "explanation of why it decided to credit [State Department] reports over [other evidence] [wa]s well reasoned." *Id*. at 349.

chances that the respondent will be sterilized if she returns to China.").[13]  Finally, even as the IJ mentioned certain pieces of record evidence in his discussion of the petitioners' U.S.-birth claim—in particular, the 2005 Country Profile from the State Department and a letter from the State Department on U.S.-birth claims—he concluded that he was "unfortunately constrained . . . to find that the [petitioners] as a matter of law cannot pursue [their U.S.-birth claim] at this time."  (A.R. 69.)

In the end, none of the cases cited by the IJ, BIA, or Government broadly concludes that the petitioners' U.S.-birth claim was foreclosed as a matter of law, or that future petitioners would be barred from using different evidence to establish asylum eligibility on similar grounds.  This is true even as we recognize that *Matter of C-C-* has set a high bar for any petitioner pursuing a U.S.-birth claim.  Nonetheless, the IJ must consider all of the relevant evidence in the record before rejecting it.

\* \* \* \* \*

For these reasons, we grant the petition for review in part and deny it in part.  We affirm the IJ's adverse credibility determination.  However, we reject the IJ's (and BIA's) conclusion that the petitioners' U.S.-birth claim was foreclosed as a matter of law, and thus remand to the IJ for further proceedings consistent with this opinion.

---

[13] Dr. John Aird was a "retired demographer" on whose affidavits many similarly situated petitioners relied.  *Yu*, 513 F.3d at 347 (3d Cir. 2007).