PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-2524
_____

QUAO LIN DONG
aka
Qiao Ling Dong

Quao Lin Dong,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
Respondent
_____

Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA No. A076-968-107)
Immigration Judge:  Honorable Charles N. Honeyman
_____

Argued January 10, 2011

Before:  RENDELL, AMBRO and FISHER, <u>Circuit</u> <u>Judges</u>

(Opinion Filed   March 25, 2011 )
_____

Joshua E. Bardavid, Esq.   **[ARGUED]**
401 Broadway, 22nd Floor
New York, NY  10013
  *Counsel for Petitioner*

Jacob A. Bashyrov, Esq.
Ilissa M. Gould, Esq.
Eric H. Holder, Jr., Esq.
Thomas W. Hussey, Esq.
Jason Wisecup, Esq.   **[ARGUED]**
United States Department of Justice
Office of Immigration Litigation, Civil division
P.O. Box 878
Ben Franklin Station
Washington, DC  20044
  *Counsel for Respondent*

_____

OPINION OF THE COURT
_____

RENDELL, <u>Circuit Judge</u>.

At issue in this appeal is an Immigration Judge's ruling, affirmed by the Board of Immigration Appeals, that the appellant, Quao Lin Dong, failed to meet her burden of proof in relation to her claim of past persecution set forth in her Application for Asylum and Withholding of Removal. The finding was based on Dong's failure to secure her husband's testimony or affidavit explaining a fact contained

in his asylum application that was inconsistent with Dong's claim and testimony. The IJ and the BIA found that corroboration was required and not provided, relying on the precedent we established in *Abdulai v. Ashcroft,* 239 F.3d 542 (3d Cir. 2001). We disagree and will remand to the BIA for further consideration consistent with this opinion. At the same time, we will affirm the BIA's ruling that Dong's claims for relief based on future persecution and under the United Nations Convention Against Torture ("CAT") must fail.

Background

On May 19, 2000, Quao Lin Dong, a Chinese national, entered the United States at or near Boston, Massachusetts without valid entry documents. Dong was detained by the United States Immigration and Naturalization Service ("INS") shortly thereafter. On June 6, 2000, the INS issued a Notice to Appear, charging Dong with removability from the United States pursuant to § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA") as an alien who, at the time of application of admission, was not in possession of "a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document." 8 U.S.C. § 1182(7)(A)(i)(I). On February 9, 2001, Dong filed an Application for Asylum and for Withholding of Removal, also later construed as an application for protection under Article III of CAT. Dong claimed that she feared return to China on account of past persecution by the Chinese authorities pursuant to China's one-child family planning policy. On December 3, 2007, after numerous continuances, Dong testified at a merits hearing in support of her application.

Dong's testimony recounted her life in China and her alleged persecution at the hands of Chinese officials. She was born in China on November 2, 1967, and was later married to Le Ju Jian. On November 3, 1991, Dong gave birth to the first of their three children, a girl. In 1992, following the birth of her daughter, Dong was forced to have an intrauterine device, or IUD, inserted for birth-control purposes. Dong described her husband being forcibly subdued while she was dragged from her home to have the procedure performed against her will. Dong's husband subsequently fled China, hoping to obtain legal status in the United States with the intention of bringing Dong and their daughter Stateside.

In 1995, Dong fell ill from the IUD and later had it removed. Jian rejoined Dong in China to care for her from April to June 1996, thereafter returning to the United States. While her husband was in China, Dong became pregnant. In January 1997, when Dong was seven months pregnant, family planning officials visited Dong's house. They told her that they knew of her pregnancy and that China's family planning policy prohibited her from having a second child. Dong was taken to another location, where she was given an injection and put into a cell. While in the cell, Dong went into labor. She was then taken to Guantow Health Hospital, where she gave birth to a still-born child.

Approximately one month later, Dong was instructed by the family planning officials to report to have another IUD inserted. Dong appeared for the insertion appointment, but she was still experiencing bleeding. After examining her, the doctor stated that she could not be fitted for the IUD at that time. Dong was told to report for a second attempt at insertion in April 1997. She was cautioned by the doctor that

4

if the second attempt at insertion proved unsuccessful, she would be forced to submit to a procedure that would result in her sterilization. Instead of taking this chance, Dong fled. She went into hiding, moving into her cousin's house which was located about two hours from her home. During this time, Dong was advised by her mother-in-law that the family planning authorities had come to her house and continued to look for Dong after she had fled. While in hiding, Dong made arrangements to join her husband in the United States. Dong left China in March 1999.

While in the United States, awaiting the completion of the related administrative proceedings, Dong gave birth to two more children. On August 11, 2001, in Philadelphia, Pennsylvania, Dong gave birth to a girl. Less than a year later, on July 27, 2002, Dong gave birth to a third child, a boy. Dong's oldest child remains in China. The two younger children live in the United States with Dong and her husband.

Dong offered several pieces of evidence to corroborate her testimony. Aside from the filing documents, initial interview transcripts, and a few other pieces of evidence offered to describe her life in the United States and the births of her three children, Dong offered three United States Department of State country reports to support her claim of fear of future persecution. Dong also offered letters authored by her mother-in-law and a relative, both of whom live in China, which buttress, in detail, her testimony as to past persecution. Specifically, her mother-in-law's letter gives an account of the events, and turmoil, that surrounded the insertion of IUDs and the alleged forced abortion, as well as Dong's flight into hiding. The relative's letter simply states

that Dong did live with him from 1997 through 1999 to avoid family planning officials.

Dong also offered medical records to reflect the events described in her testimony. Documentation of quarterly gynecological exams required by the Chinese government were offered to show the extent of the family planning policy. Medical records from Temple University Hospital in Philadelphia, Pennsylvania, from 2001 and 2002, were produced to show that Dong had discussed the abortion she was forced to undergo in China in 1997 with her doctors when seeking medical treatment here in the United States. Dong also offered a Special Disease Certificate from Guantow Central Community Hospital stating that she was seven months pregnant and had undergone an induced abortion at the facility. However, this was challenged by the government, who in rebuttal, offered a Department of Homeland Security report that claimed the certificate was fraudulent. This conclusion was based on a statement by an official at Guantow Hospital, made to consular officials as part of an investigation, claiming that the certificate was fraudulent because there was no doctor with the name on the certificate working at the hospital. Dong in turn challenged the DHS report by offering a letter from Michael Pellerin, Director of the Political Asylum Research and Documentation Service, LLC, asserting that the shortcomings of DHS's investigative methodology made its report unreliable. Pellerin highlighted the failure to research human resource records or other concrete documentation in arriving at the conclusion that the certificate was fraudulent. The DHS report itself discusses the difficulty of securing accurate information from the hospital. Specifically, the report stated that "the office does not keep any records of the certificates

having been issued … [,] the personnel of the office have been constantly changing … [, and] [s]ignature verification is also not easy to conduct."

Additionally, the record contained Dong's husband Jian's asylum application. Jian stated in his 1992 asylum claim that Dong was forced to undergo an abortion by family planning officials in 1992, while Dong had testified that the IUD was inserted in 1992 and the forced abortion occurred in 1997. When the government questioned Dong about this conflict, she expressed surprise, claiming to have only learned of this for the first time at her merits hearing. Dong offered no explanation of the inconsistency created by her husband's asylum claim, except for the comment, "he does not talk a lot and I did not ask." Dong did produce her husband's parole and travel documents to corroborate his travel to China in 1996, but she offered no live testimony or affidavit from her husband to resolve this factual discrepancy.

The IJ summarized the proceedings as a simple abortion case, requiring the IJ to find Dong credible in her testimony and persuasive in her request for discretionary relief. At the outset of his analysis, the IJ was perplexed by the absence of Dong's husband during the hearing, so much so that, after finding that Dong "largely testified consistent with the claim," the IJ held that Dong nonetheless failed to meet her burden of proof because the evidence she presented lacked specific corroboration in the form of her husband's testimony to resolve the discrepancy in dates referred to above. The IJ opined that the conflict between Dong's asylum claim and her husband's claim created enough doubt to make it reasonable for the IJ to expect this specific form of corroboration. Despite this request, Dong did not produce the

7

requested corroboration, stating that her husband was under an exclusion order – presumably to explain why it would be unreasonable to expect him to appear and testify. Dong argued that the record evidence she had produced was sufficient to corroborate her claim. The IJ did not consider what had been produced, as such, but, relying on *Abdulai,* required corroboration in the form of the husband's testimony or affidavit regarding the discrepancy in order for Dong to meet her burden of proof. Accordingly, he denied Dong asylum.

In addition, the IJ held that Dong failed to make the required showing necessary to justify asylum based on a well-founded fear of future persecution, withholding of removal, or relief under CAT. Dong appealed to the BIA, which in affirming the IJ's ruling, adopted his reasoning and dismissed the appeal.

<u>Jurisdiction, Standard Of Review,<br>And Dong's Burden Of Proof</u>

The BIA had jurisdiction over Dong's appeal from the IJ's determination pursuant to 8 C.F.R. § 1003.1. We have jurisdiction to review final orders of the BIA under 8 U.S.C. § 1252.

Dong's appeal arises from the BIA's determination; however, we have held that when the BIA has affirmed the IJ's decision, and adopted the analysis as its own, we will review both decisions. *See Sandie v. Att'y Gen.*, 562 F.3d 246, 250 (3d Cir. 2009) ("Because the IJ's corroboration discussion and determinations are affirmed and partially reiterated in the BIA's decision, we review them along with

8

the BIA decision."). Therefore, we will review the IJ's and BIA's findings of fact to determine whether they are supported by substantial evidence. *Camara v. Att'y Gen.,* 580 F.3d 196, 201 (3d Cir. 2009) ("We affirm any findings of fact supported by substantial evidence and are 'bound by the administrative findings of fact unless a reasonable adjudicator would be compelled to arrive at a contrary conclusion.'") (quoting *Yan Lan Wu v. Ashcroft*, 393 F.3d 418, 421(3d Cir. 2005)). We review the IJ's and BIA's legal determinations *de novo*. *Toussaint v. Att'y Gen.,* 455 F.3d 409, 413 (3d Cir. 2006). If we take issue with the application of law to Dong's case, we will defer to the authority granted an agency by Congress and remand to the BIA for the appropriate consideration. *I.N.S. v. Ventura*, 537 U.S. 12, 16-17 (2002).

Dong bears the burden of proof in her claim for relief. For Dong to qualify for the discretionary relief of asylum, she must establish that she satisfies the definition of "refugee" within the meaning established by Section 101(a)(42) of the INA. 8 U.S.C. § 1101(a)(42). A refugee is defined by the INA as "any person who is outside any country of such person's nationality … and who is unable or unwilling to return to … that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Additionally, "a person who has been forced to abort a pregnancy … shall be deemed to have been persecuted on account of political opinion." 8 U.S.C. § 1101(a)(42)(B).

Dong can demonstrate a well-founded fear of future persecution by showing that she "has a genuine fear, and that a reasonable person in [her] circumstances would fear

9

persecution" upon return to her native country. *Gao v. Ashcroft,* 299 F.3d 266, 273 (3d Cir. 2002). Her well-founded fear must be both subjectively and objectively reasonable. *Lukwago v. Ashcroft,* 329 F.3d 157, 177 (3d Cir. 2003). Dong's subjective fear can be shown through credible testimony that she fears persecution. *See Chang v. INS,* 119 F.3d 1055, 1066 (3d Cir. 1997). Objective reasonableness may be established by, among other things, her own testimony, the testimony of other corroborating witnesses, or submitting evidence regarding conditions in her home country. *See id.*; 8 C.F.R. § 208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.").

Dong's plea for withholding of removal requires her to establish that, upon returning to her native country, her "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." INA § 241(b)(3), 8 U.S.C. § 1231(b)(3). To receive the grant of withholding, the alien must establish a "clear probability" (or that it is more likely than not) that the alien would suffer persecution if repatriated. 8 C.F.R. § 208.16(b)(1); *INS v. Stevic*, 467 U.S. 407, 429-30 (1984). Unlike asylum, withholding of removal is mandatory rather than discretionary. *See Id.* at 423.

Dong's final claim arises out of Article III of the CAT, for which relief is available to applicants "where there are substantial grounds for believing that he would be in danger of being subjected to torture." The Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105- 277, § 2242, 112 Stat. 2681 (1999); 8 C.F.R. § 208.16(c)(1)-(2). Relief under CAT exists in the form of withholding of removal to

10

the country of torture. 8 C.F.R. § 208.16(c)(4) . CAT claims require the alien to "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." § 208.16(c)(2). In assessing the potential of torture, the IJ must consider "all evidence relevant to the possibility of future torture," along with evidence of "past torture inflicted upon the applicant," and the likelihood that an applicant could "relocate to a part of the country of removal where he or she is not likely to be tortured." § 208.16(c)(3).

## Issue Of Corroboration[1]

Before us, Dong argues that the BIA erred in requiring her husband's testimony as corroboration of her claim because it is both unnecessary and unreasonable. She urges that, since her husband was in the United States at the time of the abortion in 1997, his statement, or misstatement, on the subject was nothing more than hearsay, and of limited relevance. She also argues that his testimony pales in significance to the other probative evidence she has offered. Dong reasons that the other evidence of record – specifically, the letter from her mother-in-law, the abortion certificate, her husband's parole and travel documents, and the United States medical documentation – is much more persuasive than her husband's testimony would be. Dong also insists that it is unreasonable for the BIA to require her husband's

---

[1] Based on the standard of review, which requires that we review both the BIA's and the IJ's opinions on this matter, we will reference the BIA's opinion when discussing the situation generally, and reference the IJ's opinion when necessary. *See Sandie*, 562 F.3d at 250.

11

corroboration in light of the outstanding exclusion order entered against him, [2] and that her *husband's* assertion in *his* claim should not be determinative of *her* credibility. Though we share some of Dong's concerns regarding the relevance of her husband's testimony, we need not address them specifically, as we find that the IJ and the BIA erred by misapplying the law regarding when corroboration is necessary in order to meet one's burden of proof.

In *Abdulai* we vacated a BIA order which found that a Nigerian man failed to meet his burden for asylum due to a lack of certain corroborating evidence. 239 F.3d at 555. We held that it is appropriate for the BIA to "require otherwise-credible applicants to supply corroborating evidence in order to meet their burden of proof" when it is reasonable to expect such evidence to be produced. [3] *Id.* at 551. Our definition of reasonable in this context is "where the facts [requiring corroboration] are central to the applicant's claim and easily subject to verification." *Chukwu v. Att'y Gen.*, 484 F.3d 185, 192 (3d Cir. 2007). In *Abdulai*, we approved of the three-step inquiry utilized by the BIA when considering the need for

---

[2] Le Ju Jian's status is subject to a final order of exclusion with a denied motion to reopen dated July 24, 2006.

[3] The REAL ID Act of 2005, although inapplicable to the current situation because it only applies to asylum applications filed after May 11, 2005, codified the standard we adopted in *Abdulai*. 8 U.S.C. §1158(b)(1)(B) ("Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.").

corroboration. 239 F.3d at 554. We held that the IJ can find that a petitioner's failure to produce corroborating evidence is fatal, but only after following the three-step inquiry, which requires:

> (1) an identification of the facts for which "it is reasonable to expect corroboration;" (2) an inquiry as to whether the applicant has provided information corroborating the relevant facts; and, if he or she has not, (3) an analysis of whether the applicant has adequately explained his or her failure to do so.

*Id.* at 554 (*quoting In re S-M-J-,* 21 I. & N. Dec. 722 (BIA 1997)). This inquiry also requires that an applicant be given the opportunity to produce the corroborating evidence. *Id.* In *Abdulai* we vacated the BIA's order and remanded for further proceedings because the IJ failed to perform the first step of the inquiry, namely, to identify "what particular aspects of [the applicant's] testimony it would have been reasonable to expect him to have corroborated." 239 F.3d at 554.

We have required faithful adherence to the three-prong test. In *Chukwu v. Attorney General,* we remanded the BIA's determination that Chukwu, a Nigerian, failed to meet his burden of proof for an asylum claim that was based on a fear of persecution due to his membership in MASSOB – the Movement for the Actualization for the Sovereign State of Biafra. 484 F.3d at 193. In that case, as in *Abdulai*, the IJ failed to give sufficient notice to the applicant of the need to corroborate his claim of being a member of MASSOB – the first requirement of the *Abdulai* inquiry – and, therefore, did not give the applicant the opportunity to supply evidence that

13

would have satisfied his burden. *Id.* Conversely, in *Sandie v. Attorney General*, we upheld the IJ's denial of a Sierra Leone native's application for asylum due to a failure to corroborate. 562 F.3d at 254. In doing so, we stated that the IJ adequately performed the *Abdulai* inquiry: giving notice to the applicant of the facts requiring corroboration, offering ample opportunity to supply corroboration, and thoroughly reviewing, on the record, the evidence offered to corroborate prior to concluding that he failed to meet his burden. *Id.* at 253. Here, however, we conclude that, unlike in *Sandie,* the IJ – in focusing solely on the absence of corroboration regarding Jian's statement about an alleged forced abortion in 1992 in denying Dong's claim – failed to follow the steps required by *Abdulai.*

The essence of Dong's claim, as the IJ highlighted in the initial proceedings, is Dong's allegation that she was forced by officials to abort a pregnancy in her native China in 1997. We presume that the IJ believed that it was reasonable to have corroboration of the fact of the forced abortion in 1997, and we have little difficulty in finding that it was reasonable for him to have this expectation. Dong offered corroboration of this fact by producing, among other things, the letter from her mother-in-law, the special disease certificate from Guantow Central Community Hospital, her medical records from her doctors' visits here in the United States, and her husband's parole and travel documents from his trip to China in 1996. The IJ and the BIA failed to consider whether this evidence satisfied step (2) under *Abdulai*, that is, whether it corroborated her claim that she was forced to undergo an abortion in 1997 when she was seven months pregnant. Rather, the IJ and the BIA found that because there was a question raised by the statement in Jian's

14

application, there was a need to specifically corroborate her story with his testimony or an affidavit from her husband. Without this "corroboration," the BIA concluded that Dong failed to meet her burden of proof.

In his opinion, the IJ reasoned that Dong's husband was a "star witness" who could shed light on the conflict between the two applications. While his affidavit may have cleared up the misunderstanding, we think the focus on this particular evidence as "corroborating" and required under our jurisprudence was misplaced. First, corroborating evidence is required if needed to prove a fact, and if it is "central" to one's claim. *Chukwu*, 484 F.3d at 192. If Dong's claim is that she was forced to have an abortion in 1997 when Jian was *not* present in China, how is Jian's testimony about that event necessary, let alone "central" to Dong's claim? The situation would be different if Jian had been in China at that time and his application contained a direct inconsistency regarding what occurred in 1997. But that is not the case. Moreover, how is his explanation as to what occurred in 1992 either "central" or "corroborating" as to events that occurred five years later, in 1997? We, thus, question the characterization of Jian's missing evidence as "corroborating" the fact in question.

Even more important, had the IJ properly followed the three-step *Abdulai* inquiry, the IJ would have reasoned through the main issue – whether or not Dong met her burden of proof in her asylum application. As noted above, the IJ did satisfy step one of the inquiry by pointing to the facts surrounding the alleged forced abortion as those that would require corroboration. But the IJ then muddied the waters by shifting his focus away from whether Dong actually

15

"provided information corroborating the relevant facts" concerning the alleged forced abortion in 1997. *Abdulai* at 554. Instead, the IJ dwelled on what her husband's explanation would be as to what occurred in 1992 and why Dong did not produce him to explain himself. The IJ concluded that Dong's failure to produce an affidavit from her husband – deemed necessary "corroboration" by the IJ – defeated her claim. We suggest that this is not what our precedent in *Abdulai* calls for.

*Abdulai* typically comes into play when a petitioner has testified, apparently credibly, about the facts giving rise to her claim, but the IJ believes it would be "reasonable" for her to have corroboration of one or more facts, such that he imposes an obligation on her to produce corroboration in order to meet her burden. The next step is to assess whether such corroborating evidence has been supplied. If it is "reasonable" to expect corroboration of the fact to be produced – that is, such evidence is central and available – and it has been produced, *Abdulai* is satisfied. As to corroboration not supplied, under step three, the IJ asks if the failure is satisfactorily explained.

Here, step two was not performed at all. The IJ should have weighed the Guantow Hospital certificate against the DHS report and addressed the relative merits of these documents. The IJ should have evaluated the letters from Dong's family to gauge their corroborative value. The IJ should have considered Dong's husband's parole and travel documents to see whether they explain his whereabouts in relation to Dong's assertions. The IJ should also have reviewed Dong's United States medical records and considered whether the fact that Dong discussed her alleged

16

forced abortion with her doctors in the United States – when seeking medical care for the pregnancies that resulted in the birth of Dong's two youngest children – reflects favorably on whether this did in fact occur, and thus constitutes meaningful corroboration of her claim. All of this evidence should be considered to gauge whether Dong met her burden to corroborate her testimony.

The only aspect not "corroborated" was, we suggest, not really an issue of "corroboration" at all, but rather an explanation as to a statement made by her husband in his application about a forced abortion in 1992. While the absence of explanation from her husband is perhaps perplexing, it does not amount to a lack of corroboration, nor does it undermine the force of any of the other specific corroborating evidence. And while under step three we might question why Dong would fail to produce an explanation from her husband, we do know he was under a removal order and we can imagine a host of other possible reasons. While the IJ seems to assume a wife can readily produce a statement from her husband, we suggest that is not necessarily an appropriate assumption,[4] let alone a proper basis for an

--------------------------------------

[4] At the merits hearing, the IJ seemed to take issue with Dong's assertion that she only then learned about her husband's claim in his asylum application as to what occurred in 1992. Dong repeatedly stated that she was not privy to information about her husband's asylum application and that the only way to get this information would be to ask her husband. The record fails to show that the IJ considered any differences in Chinese cultural norms which may have informed her lack of knowledge and general reticence when discussing her relationship with her husband. In *Dia v.*

17

adverse finding when other evidence has been offered to corroborate her version of events. Accordingly, we will remand to the BIA to remand to the IJ for proper analysis of the evidence under *Abdulai*.

Claims Of Persecution Upon Her Return To China

Dong also makes asylum, withholding of removal, and relief under CAT claims in her application based on a fear of future persecution and torture upon her return to China. The BIA held that Dong failed to meet her burden of proof for these claims. We agree.

Dong argues that, under China's family planning policy, because she will return to China the mother of three, she will be subjected to forced sterilization or substantial monetary fines. The BIA held that Dong failed to support these claims with enough evidence to meet her burden of proof. After analyzing the evidence, the BIA determined that the evidence presented by Dong does not show any pattern or practice of persecution by Chinese officials of applicants on account of the birth of children in the United States.[5] The BIA also reasoned that Dong's claim was unsuccessful

*Ashcroft*, we commented on the error that an IJ makes in ignoring cultural differences in customs and communication when making credibility determinations. 353 F.3d 225, 276 (3d Cir. 2003) (*en banc*) ( McKee, J., concurring in part and dissenting in part).

[5] In *Liu v. U.S. Attorney General,* after reviewing substantially similar evidence, we reached an identical conclusion. 555 F.3d 145, 150 (3d Cir. 2009); s*ee also Matter of J-W-S-*, 24 I. & N. Dec. 185 (BIA 2007).

18

because: (1) she failed to show that Chinese officials were still looking for her; (2) Dong's documentation was general country condition information that failed to evince how potential persecution would specifically apply to her; and (3) Dong failed to provide any evidence at all that proved the potential of fines being levied against her. In light of the substantial evidence standard of review that governs our analysis, we will not disturb the BIA's conclusions related to Dong's failure to meet her burden of proof for her claims based on a fear of future persecution.

## Conclusion

Accordingly, we will affirm the BIA's ruling as it relates to Dong's CAT claim and her asylum claim based on a fear of future persecution. We will vacate the order denying Dong's application for asylum and withholding of removal based on past persecution, and we will remand this aspect of her claim to the BIA so it can be remanded to the IJ for further proceedings consistent with this opinion.