PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2444
_____

AYUB JUMA LUZIGA,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
Respondent
_____

On Petition for Review from an
Order of the Board of Immigration Appeals
(Agency No. A205-947-666)
Immigration Judge:  Roxanne C. Hladylowycz
_____

Argued June 17, 2019
Before:  AMBRO, RESTREPO and FISHER, *Circuit Judges*.

(Filed: September 5, 2019)

Khary Anderson  [ARGUED]
University of Pennsylvania
School of Law
3400 Chestnut Street

Philadelphia, PA 19104

Joseph P. Archie
Nicolas A. Novy
Dechert
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA 19104
        *Counsel for Petitioner*

Jennifer R. Khouri  [ARGUED]
Tim Ramnitz
Chad A. Readler, Acting Assistant Attorney General
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

An Immigration Judge (IJ) decided, and the Board of Immigration Appeals (BIA) agreed, that Petitioner Ayub Luziga is ineligible for withholding of removal under the Immigration and Nationality Act (INA) and the Convention Against Torture (CAT) because he was convicted of a "particularly serious crime," and that he is not entitled to deferral of removal under the CAT because he failed to carry

2

his burden of proof. Luziga requests our review, arguing that the IJ and BIA made two legal errors. First, Luziga argues that the IJ and BIA misapplied the framework for making particularly serious crime determinations, a framework the BIA itself has established in its precedential opinions. Second, Luziga argues that the IJ failed to observe the rule we articulated in *Abdulai v. Ashcroft*, 239 F.3d 542, 554 (3d Cir. 2001), requiring immigration judges to notify a noncitizen in removal proceedings that he is expected to present corroborating evidence before finding that failure to present such evidence undermines his claim. We agree that the IJ and BIA erred in these respects; therefore, we will grant Luziga's petition for review, vacate the underlying order, and remand.[1]

I.

Ayub Luziga, a native of Tanzania, was lawfully admitted to the United States as a visitor twenty years ago. He later applied and was approved for a student visa but eventually fell out of lawful status. In 2014, he was arrested and indicted for wire fraud in violation of 18 U.S.C. § 1343 and conspiracy to commit the same in violation of 18 U.S.C. § 1349. The Government alleged that from 2007 to 2008, Luziga, his then-wife, Annika Boas,[2] and fellow Tanzanians conspired to "fraudulently secure residential mortgage loans funded by federally-insured financial institutions by causing materially

---

[1] The Court wishes to express its gratitude to a recent graduate of the University of Pennsylvania Law School, Khary Anderson, and his supervising lawyers, Joseph Patrick Archie and Christopher J. Mauro of Dechert LLP, for their excellent *pro bono* representation of the Petitioner in this matter.

[2] The record indicates that Luziga and Boas were in divorce proceedings in October 2015. Their current marital status is not reflected in the record.

false statements to be made during the loan application and approval process." Certified Administrative Record (C.A.R.) 1026-28.

Luziga pleaded guilty to the conspiracy charge and was sentenced to twenty-one months' imprisonment. His conduct caused losses between $400,000 and $1,000,000, and he personally received checks totaling at least $54,863.11. He was ordered to pay restitution of almost $1,000,000.

Luziga cooperated in the investigation of his co-conspirators and testified against his wife, who was convicted and sentenced to twenty-seven months' imprisonment. While Luziga prepared to testify, prosecutors asked him about the location of Mrisho Nzese, who had been convicted for his role in the conspiracy but fled the country. They also wanted Luziga to ask his stepfather, a police commissioner and the chief of INTERPOL in East Africa, to help return Nzese to the United States. News of the investigation and Luziga's cooperation with prosecutors spread through the Tanzanian community in the United States and abroad.

While Luziga was serving his sentence, the Department of Homeland Security (DHS) ordered him removed by final administrative order. *See* 8 U.S.C. § 1228(b). However, because Luziga expressed a reasonable fear of returning to Tanzania, DHS referred him to the Executive Office for Immigration Review (EOIR) for removal proceedings, where he requested withholding of removal under the INA and the CAT, and deferral of removal under the CAT. *See* 8 C.F.R.

4

§ 208.31. At Luziga's individual hearing,[3] the IJ heard part of his testimony before deciding that his conspiracy conviction was a conviction for a particularly serious crime, making him ineligible for withholding of removal under the INA, 8 U.S.C. § 1231(b)(3)(B)(ii), and the CAT, 8 C.F.R. § 1208.16(d)(2). The IJ allowed the hearing to proceed on the issue of deferral of removal under the CAT.

In support of his request for deferral of removal, Luziga explained that he feared torture and testified that his parents-in-law threatened to "make sure that [he] suffer[s]" in Tanzania and said he "would never even survive a day in Africa." C.A.R. 472-73. Luziga understood this to mean that they would kill him. Nzese, the co-conspirator who had fled the United States, made similar threats. Luziga learned of Nzese's threats from two sources. First, he received a letter from a friend reporting that "the other guy who went [to Tanzania]," who Luziga believed to be Nzese, blamed Luziga for trying to bring him back to the United States. C.A.R. 509-10, 974. Second, a friend of his then-wife who "[hung] out [at] a lot of parties in Tanzania" with Nzese, C.A.R. 501, wrote to Luziga warning him of Nzese's threats. Annika's friend also testified telephonically in support of Luziga's request for relief from removal.

Luziga testified that his parents-in-law and Nzese could act on threats with assistance from Tanzanian officials, or at least with impunity. He claimed that Nzese is the nephew of

---

[3] The hearing where parties are afforded the opportunity to make opening and closing statements, present and object to evidence, and present and cross-examine witnesses before an IJ is known as the "individual calendar hearing." U.S. Dep't of Justice, Office of the Chief Immigration Judge, Immigration Court Practice Manual, § 4.16 (2019).

5

Tanzania's former president. And he believed that his father-in-law, Nicholas Boas, knew "top level" officials through his work.[4] C.A.R. 477. Luziga believed that another co-conspirator's father was a retired general. Luziga testified that, in his experience, connections with Tanzanian officials shield perpetrators of violence from criminal culpability. He described a time when his friend, whose grandfather was a member of parliament, shot a bus driver without any criminal consequence. Luziga feared that his parents-in-law and Nzese could do the same to him. Though his own stepfather occupied a position of prominence, Luziga feared this would not suffice to protect him due to his stepfather's fragile health and waning influence, among other things.

The IJ found that Luziga testified in a "forthright and frank fashion," C.A.R. 445, and made no adverse credibility determination. In the absence of an explicit adverse credibility determination, we assume that the noncitizen testified credibly. *Camara v. Att'y Gen.*, 580 F.3d 196, 201 (3d Cir. 2009).

Luziga also presented the testimony of an expert witness, Professor Ned Bertz, an associate professor at the University of Hawaii with expertise in Tanzanian "history . . . encompass[ing] politics[,] culture[,] religion[,] ethnicity[,] and current events, as well as issues of crime [and] violence." C.A.R. 521-22. Professor Bertz validated Luziga's fears, testifying that in Tanzania "[p]eople with government contacts have the ability . . . to enact violence against other individuals if they so choose." C.A.R. 530. And while Professor Bertz could not verify the alleged connection between Nzese and the

---

[4] The exact nature of Luziga's father-in-law's work with the government is unclear. Luziga testified that his father-in-law had a government contract and gave speeches, but he was not aware of the nature of these speeches.

6

former president, he confirmed that the former president was directly involved in the selection of the current president and that Nzese appeared to be an influential member of the same political party.

After the close of evidence and counsel's final remarks, the IJ announced her opinion and decision. She first addressed her particularly serious crime determination, explaining that Luziga's conviction for participation in a fraud scheme that resulted in losses of nearly $1,000,000 constituted a particularly serious crime under Third Circuit precedent and calling Luziga's criminal pre-sentencing report "quite dispositive." C.A.R. 432-33. She accordingly found Luziga ineligible for withholding of removal under the INA and the CAT and pretermitted those applications.

Addressing Luziga's request for deferral of removal, the IJ decided that Luziga had not carried his burden of proof. She accepted that there had been threats against him, but highlighted what she saw as shortcomings in his evidence. She said there was "absolutely no showing whatsoever that either Mrisho Nzese or [Luziga]'s parents-in-law have the capacity somehow to cause [his] torture." C.A.R. 446. She stated there was "no proof" that Luziga's parents-in-law and Nzese had government connections: "[O]ther than one individual so opining, and [Luziga] also opining that [Nzese] is the nephew of the ex-president[,] . . . [t]here is no independent corroborative information supplied on this issue, and that causes the issue to fail under the burden of proof standard." *Id.* Even assuming Luziga's co-conspirators' government connections, she found that Luziga did not satisfy his burden of proof on the nexus between torture and government action or culpable inaction because "the suggestion that the ex-president would . . . do something unlawful to vindicate [] Nzese, is supported by nothing at all on the record other than

7

some opining by [the] expert . . . and [Luziga]'s own opinions about that"; and "there is nothing to substantiate" that Luziga's parents-in-law could torture him with the acquiescence of the government. C.A.R. 446-47. Finally, she found that "[t]here is absolutely nothing to substantiate [Luziga]'s contention that his own stepfather . . . would be unable to protect [him]." C.A.R. 447. The IJ found these failures of proof dispositive of Luziga's claim.

Luziga appealed to the BIA[5] and argued that the IJ erred in her particularly serious crime determination because, while precedent requires a two-step analysis, the IJ had "skipped the preliminary step to determine whether the elements of federal wire fraud bring 'the crime into a category of particularly serious crimes.'" C.A.R. 28 (citing *In re N-A-M-*, 24 I. & N. Dec. 336, 342 (B.I.A. 2007)). He also argued that the IJ clearly erred in finding that he had failed to present corroborating evidence, erroneously required corroborating evidence when he had credibly testified to the details of his claim, and failed to find that additional corroborating evidence was readily available such that its absence could be held against him.

The BIA agreed with the IJ and dismissed the appeal. To the IJ's particularly serious crime determination, it added that the IJ applied the correct legal standard and that "the nature of [Luziga]'s crime, as measured by the elements of the offense, i.e., participation in a scheme to defraud victims of nearly $1,000,000, brings [his] crime within the range of a particularly serious offense" under BIA and Third Circuit precedent. C.A.R. 2-3. Thus, the BIA held that the IJ "properly considered the nature and scope of [Luziga's] crime, the

---

[5] Luziga's appeal involved several intermediate steps, which are not relevant to our review of the issues presented in the petition.

sentence imposed, and the circumstances and underlying facts" in making that determination. C.A.R. 3. Luziga timely filed a petition for review with this Court.

## II.

The BIA had jurisdiction under 8 C.F.R. § 1003.1(b)(3). We have jurisdiction to review final orders of removal under 8 U.S.C. § 1252. Noncitizens petition for review "with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings." 8 U.S.C. § 1252(b)(2). In this case, the IJ entered her appearance over proceedings in York, Pennsylvania from Arlington, Virginia. A panel of this Court previously noted that venue is proper where an IJ sitting outside our Circuit appears by video conference within our Circuit. *See Angus v. Att'y Gen.*, 675 F. App'x 193, 196 n.4 (3d Cir. 2017) (addressing venue where the IJ conducted a hearing in York by video conference from Arlington and explaining that venue under §1252(b)(2) is "non-jurisdictional") (quoting *Khouzam v. Att'y Gen.*, 549 F.3d 235, 249 (3d Cir. 2008)). Neither party has challenged venue, which—we now hold—is appropriate in this Court.

We usually review the BIA's opinion as the agency's "final order." *Zhang v. Gonzales*, 405 F.3d 150, 155 (3d Cir. 2005).[6] However, "[w]hen, as here, the BIA affirms an IJ's decision and adds analysis of its own, we review both the IJ's and the BIA's decisions," *Martinez v. Att'y Gen.*, 693 F.3d 408, 411 (3d Cir. 2012), referring to the BIA's opinion "generally" and to the IJ's opinion "when necessary." *Quao Lin Dong v. Att'y Gen.*, 638 F.3d 223, 229 n.1 (3d Cir. 2011).

---

[6] The "agency" is the EOIR, an agency within the Department of Justice that includes the BIA, 8 C.F.R. § 1003.0(a), and immigration courts, *id.* § 1003.9(a).

Our review is restricted by statute. Pursuant to the administrative exhaustion requirement, 8 U.S.C. § 1252(d)(1), a petitioner may present an issue to this Court only if he or she has "first raise[d] [it] before the BIA or the IJ." *Joseph v. Att'y Gen.*, 465 F.3d 123, 126 (3d Cir. 2006). While we prefer that a petitioner unambiguously articulates his argument to the agency, our exhaustion policy is liberal: if the petitioner "makes some effort, however insufficient," that puts the agency on notice of a straightforward issue, the requirement is satisfied. *Id.* (quoting *Yan Lan Wu v. Ashcroft*, 393 F.3d 418, 422 (3d Cir. 2005)). We are further limited by the prohibition against review of final removal orders for noncitizens convicted of aggravated felonies, 8 U.S.C. § 1252(a)(2)(C), and the prohibition against review of matters entrusted to the Attorney General's discretion, *id.* § 1252(a)(2)(B)(ii).[7]

We have jurisdiction to review constitutional and legal questions, *id.* § 1252(a)(2)(D), such as "[w]hether an IJ applied the correct legal standard." *Alaka v. Att'y Gen.*, 456 F.3d 88, 103 (3d Cir. 2006); *see also Nkomo v. Att'y Gen.*, 930 F.3d 129, 135 (3d Cir. 2019) ("We have jurisdiction to review claims that the [BIA] misapplied its precedents."). We review legal questions and the application of law to fact *de novo* with appropriate deference to the BIA's reasonable interpretation of the INA. *Yusupov v. Att'y Gen.*, 518 F.3d 185, 197 (3d Cir. 2008) (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council,*

---

[7] Section 1252(a)(2)(B)(ii) only prohibits our review of matters specifically delegated to the Attorney General's discretion. *See Kucana v. Holder*, 558 U.S. 233, 251 (2010) (explaining the correct interpretation of § 1252(a)(2)(B)(ii) in light of "the presumption favoring judicial review of administrative action"); *see also Yusupov v. Att'y Gen.*, 518 F.3d 185, 195 n.15 (3d Cir. 2008).

*Inc.*, 467 U.S. 837, 842-43 (1984)).[8] If, upon review, we "take issue with the application of law" to the case, "we will defer to the authority granted an agency by Congress and remand . . . for the appropriate consideration." *Quao Lin Dong*, 638 F.3d at 228.

III.

A. *Withholding of Removal and Particularly Serious Crime Determinations*

Luziga's first challenge to the agency's final order is that the IJ and BIA erred in deciding that his conviction for conspiracy to commit wire fraud is a conviction for a "particularly serious crime," making him ineligible for withholding of removal.

Withholding of removal is a mandatory form of relief that prevents removal of a noncitizen to a country where that individual's life or freedom would be threatened because of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A); *Ghebrehiwot v. Att'y Gen.*, 467 F.3d 344, 351 (3d Cir. 2006). Withholding of removal is also available under the CAT for those who establish that it is more likely than not that they will be tortured if removed. 8 C.F.R. § 1208.16(c). A noncitizen seeking relief under the CAT does not need to connect the prospect of torture with "any protected status," such as race, religion, or a particular social group. *Silva-Rengifo v. Att'y Gen.*, 473 F.3d 58, 64 (3d Cir. 2007).

---

[8] We owe deference to the BIA only when it acts "in the exercise of congressionally-delegated authority to make rules carrying the force of law," meaning "unpublished, single-member BIA decisions are not entitled to *Chevron* deference." *Mahn v. Att'y Gen.*, 767 F.3d 170, 173 (3d Cir. 2014).

11

Withholding of removal, though generally mandatory for those who meet the criteria, is not available to individuals who have been convicted of a "particularly serious crime." 8 U.S.C. § 1231(b)(3)(B)(ii); 8 C.F.R. § 1208.16(d)(2). An aggravated felony is a particularly serious crime *per se* if it resulted in a "term of imprisonment of at least 5 years." 8 U.S.C. § 1231(b)(3)(B). For other offenses, the Attorney General, or the BIA in its exercise of delegated adjudicatory authority, *Kucana*, 558 U.S. at 239, decides whether an offense is particularly serious. 8 U.S.C. § 1231(b)(3)(B).[9]

Though § 1231(b)(3)(B) directs immigration adjudicators to decide whether an offense is particularly serious, the INA is "silent" about how the determination should be made. *Chong v. INS*, 264 F.3d 378, 387 (3d Cir. 2001). In the BIA's first attempt at filling this gap, it stated that "an exact definition of a 'particularly serious crime'" could not be given. *Matter of Frentescu*, 18 I. & N. Dec. 244, 247 (B.I.A. 1982). However, it provided general guidance: sometimes offenses are or are not "particularly serious crimes" on their face, but most of the time the determination is made on a "case-by-case" basis, taking into consideration "such factors as [1] the nature of the conviction, [2] the circumstances and underlying facts

---

[9] Particularly serious crime determinations are not among the matters specifically delegated to the Attorney General's discretion, and therefore we review them *de novo*. *Denis v. Att'y Gen.*, 633 F.3d 201, 214 n.18 (3d Cir. 2011) (citing *Alaka*, 456 F.3d at 101–02). We had previously held that only aggravated felonies could be particularly serious crimes. *Alaka*, 456 F.3d at 104-05. We recently reconsidered that holding as a full court. *Bastardo-Vale v. Att'y Gen.*, No. 17-2017 (3d Cir. Aug. 12, 2019) (en banc). Luziga concedes that his conspiracy conviction is an aggravated felony.

of the conviction, [3] the type of sentence imposed, and, most importantly, [4] whether the type and circumstances of the crime indicate that the alien will be a danger to the community." *Id.* Over time, the *Frentescu* factors evolved: the BIA eliminated the "separate determination to address whether the alien is a danger to the community," *In re N-A-M-*, 24 I. & N. Dec. 336, 342 (B.I.A. 2007) (citing *Matter of Carballe*, 19 I. & N. Dec. 357 (B.I.A. 1986)), and moved away from focusing on the sentence imposed as a "dominant factor" in the determination. *Id.* at 343.[10]

Then, in *N-A-M-*, the BIA incorporated the *Frentescu* factors into a two-step analysis and articulated the current legal standard for particularly serious crime determinations. First, adjudicators consider whether the elements of an offense "potentially bring the crime into a category of particularly serious crimes." 24 I. & N. Dec. at 342.[11] If not, then "the individual facts and circumstances of the offense are of no consequence, and the alien would not be barred from a grant of withholding of removal." *Id.* at 342. If, however, the elements

---

[10] Though *Frentescu* was rendered inapplicable in many cases when Congress amended the INA in 1990 and linked particularly serious crimes to aggravated felonies, *id.* at 339-40, the BIA eventually "revived the *Frentescu* case-by-case analysis," *Blandino-Medina v. Holder*, 712 F.3d 1338, 1347 (9th Cir. 2013) (citing *In re L-S-*, 22 I. & N. Dec. 645, 649 (B.I.A. 1999) (en banc)), after intervening legislation restored some of the Attorney General's discretion. For a thoughtful review of this history, see *L-S-*, 22 I. & N. Dec. at 649-51.

[11] In *N-A-M-*, the BIA also reasserted that adjudicators may make particularly serious crime determinations solely on the elements of a crime. *Id.* at 342-43. Elements-only determinations are outside the scope of this case.

do "potentially bring the offense within the ambit of a particularly serious crime," then an adjudicator may make the determination by considering "all reliable information[,] . . . including the conviction records and sentencing information, as well as other information outside the confines of a record of conviction." *Id.*

Before *N-A-M-*, we deferred to the *Frentescu* analysis because it was reasonable. *Chong*, 264 F.3d at 388 (holding that the BIA's interpretation of § 1231(b)(3)(B) "guides and channels the Attorney General's discretion[,] . . . thereby helping to ensure that the Attorney General does not make [the 'particularly serious crime'] determination in an arbitrary or inconsistent manner") (citing *L-S-*, 22 I. & N. Dec. at 651 (holding "[w]e will . . . employ *Frentescu*" for aggravated felonies with a sentence of fewer than five years)). Then, we deferred to the analysis announced in *N-A-M-*. *Denis v. Att'y Gen.*, 633 F.3d 201, 214-16 (3d Cir. 2011) (noting that *N-A-M-* "provided more clarity as to the evidence that may be considered in deciding whether an offense is particularly serious").

Luziga, like the noncitizen in *Denis*, committed an aggravated felony that was not a particularly serious crime *per se*. The IJ and BIA therefore had to decide whether he had committed a particularly serious crime. Luziga argues that the IJ and BIA failed to correctly apply the analysis articulated in *N-A-M-*, skipping right over the preliminary consideration of elements. He is correct: the agency should have applied the *N-A-M-* analysis, but from the record it is clear that both the IJ and BIA failed to apply *N-A-M-* correctly.

The BIA began its particularly serious crime analysis by approving of the IJ's application of the "proper legal standard." C.A.R. 2. However, when the IJ made the particularly serious crime determination, she failed to first consider the elements

14

of Luziga's offense. In her preliminary determination, she focused on the loss amount of up to $1,000,000, found our decision in *Kaplun v. Attorney General* controlling,[12] and announced that Luziga would be barred from withholding of removal. When the IJ addressed the particularly serious crime determination for a second time in her opinion, she explained that the case "clearly [fell] under the rubric of [*Kaplun*]," emphasized her reliance on the facts and circumstances in the pre-sentencing report and plea agreement, and found that Luziga's participation in the conspiracy involved not only monetary loss, but also identity theft. C.A.R. 432-35. She made no reference to the elements of Luziga's offense, that is "(1) two or more persons entered the unlawful agreement charged in the Superseding Indictment [the conspiracy]; and (2) [Luziga] knowingly and willfully became a member of that conspiracy." C.A.R. 197 (Luziga Plea Agreement). To the extent that the BIA decided that the IJ correctly applied the

---

[12] In *Kaplun v. Attorney General*, which was decided before we approved of the *N-A-M-* framework, we found no error in the BIA's determination that the noncitizen's securities fraud conviction with losses of almost $900,000 constituted a particularly serious crime. 602 F.3d 260, 267-68 (3d Cir. 2010). The Attorney General argues that, by citing *Kaplun*, the agency performed the first step in *N-A-M-*. However, mere citation to *Kaplun* is insufficient for us to draw that inference, and we are not at liberty to "supply the basis for [an agency] decision where appropriate reasons are not set forth by the administrative agency itself." *Wang v. Att'y Gen.*, 423 F.3d 260, 271 (3d Cir. 2005). Moreover, our decision in *Kaplun* does not dictate that aggravated felony financial crimes must potentially fall within the ambit of particularly serious crimes.

15

proper legal standard for the particularly serious crime determination, it erred.

The BIA's added analysis did not fix this error. Though it cited *N-A-M-* and even stated that it would consider the "elements" of Luziga's offense, the BIA listed as "elements" specific offense characteristics such as loss amount. C.A.R. 2-3 ("[T]he nature of the applicant's crime, as measured by the elements of the offense, i.e., participation in a scheme to defraud victims of nearly $1,000,000, brings the applicant's crime within the range of a particularly serious offense."). That is, rather than considering the elements of conspiracy to commit wire fraud, the BIA described a hybrid of the elements and facts of Luziga's conviction. The BIA's failure to correctly apply its own precedent for the particularly serious crime determination, to which we have consistently deferred, requires remand for "appropriate consideration." *Quao Lin Dong*, 638 F.3d at 228. On remand, the agency should first determine whether the elements of Luziga's offense potentially fall within the ambit of a particularly serious crime. Only then may it proceed to consider the facts and circumstances particular to Luziga's case.

B. *Deferral of Removal and Corroboration Determinations*

Luziga's second challenge to the agency's final order is that the IJ failed to notify him that he was expected to present corroborating evidence regarding the likelihood that he would be tortured in Tanzania before she denied his request for CAT deferral.

Deferral of removal under the CAT is a last-resort form of relief that is "like an injunction" in that, "for the time being, it prevents the government from removing the person in question, but it can be revisited if circumstances change." *Wanjiru v. Holder*, 705 F.3d 258, 264 (7th Cir. 2013). It does not give a noncitizen any legal status and it can be terminated

16

at any time. 8 C.F.R. § 1208.17. But for removable noncitizens facing a likelihood of torture and no other avenues of relief, it's better than nothing.

To demonstrate entitlement to this form of relief, a noncitizen must prove that there is a greater likelihood than not that he will be tortured in the country to which he will be removed, *id.*, "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* § 1208.18(a)(1). "Acquiescence" of an official is defined as when a "public official, prior to the activity constituting torture, [has] awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such activity." *Id.* § 1208.18(a)(7). It is not limited to situations where officials have "actual knowledge" of torture but includes "willful blindness." *Silva-Rengifo*, 473 F.3d at 65, 68 (citing *Zheng v. Ashcroft*, 332 F.3d 1186, 1194 (9th Cir. 2003)).

As with asylum or withholding of removal, noncitizens seeking deferral of removal bear the burden of proof. *Mulanga v. Ashcroft*, 349 F.3d 123, 133 & n.6 (3d Cir. 2003) (citing 8 C.F.R. § 208.16(c)(2)); *see also* 8 C.F.R. § 1208.17. A noncitizen may carry his burden with credible testimony alone. 8 C.F.R. § 1208.16(c)(2). However, corroborating evidence may be required when it is reasonable to expect it, such as for "facts [that] are central" to a claim and easily verified. *Chukwu v. Att'y Gen.*, 484 F.3d 185, 192 (3d Cir. 2007). Before requiring corroborating evidence, i.e., deciding that "failure to corroborate undermines" a claim, an IJ must follow the *Abdulai* inquiry. *Saravia v. Att'y Gen.*, 905 F.3d 729, 736 (3d Cir. 2018). The inquiry demands that an IJ requiring corroboration first:

> (1) [identify] . . . the facts for which 'it is reasonable to expect corroboration;' (2) [inquire]

17

as to whether the applicant has provided information corroborating the relevant facts; and, if he or she has not, (3) [analyze] whether the applicant has adequately explained his or her failure to do so.

*Id.* (citing *Abdulai v. Ashcroft*, 239 F.3d 542, 554 (3d Cir. 2001)). Where an IJ fails to "develop [a noncitizen applicant's testimony] in accord with the *Abdulai* steps" and "hold[s] the lack of corroboration against [the] applicant," we vacate and remand. *Chukwu*, 484 F.3d at 192. We strictly enforce this rule. For example, in *Saravia* we remanded for a new determination where the IJ asked the noncitizen "why he *had not* submitted corroborating evidence," instead of asking "whether he *could* not corroborate his testimony" and providing an opportunity to do so. 905 F.3d at 738–39.

Luziga argues that he never received notice or an opportunity to provide corroborating evidence before the IJ faulted him for failing to corroborate his CAT deferral claim.[13] Before we address the merits of his argument, we must first address whether Luziga adequately exhausted the issue to permit our review. *See* 8 U.S.C. § 1252(d)(1).

Before the BIA, Luziga argued that the IJ failed to find that corroborating evidence beyond what he had provided was "readily available" such that failure to produce it could be held against him. C.A.R. 43. He also questioned the correctness of

---

[13] Luziga also argues that the IJ overlooked corroborating evidence he did provide. Overlooking corroborating evidence in the record is an error at step two of the *Abdulai* inquiry. Because we will remand for a new corroboration determination, the IJ will have an opportunity to address any corroborating evidence already in the record.

18

the IJ's corroboration findings, calling them "clearly erroneous." C.A.R. 39-40. Under our liberal exhaustion policy, *see Yan Lan Wu*, 393 F.3d at 422, this is adequate. Luziga was not required to unambiguously raise the IJ's failure to follow the three steps of the *Abdulai* inquiry as long as he "place[d] the Board on notice of a straightforward issue being raised on appeal." *Id.* In questioning the correctness of the IJ's corroboration determination, Luziga put the BIA on notice of an error in that determination.

The BIA agreed with the IJ's decision on Luziga's CAT deferral claim without adding analysis, so we review the IJ's decision. *Zhang*, 405 F.3d at 155. The record clearly shows that the IJ did not perform the *Abdulai* inquiry before announcing her decision.[14] She never asked Luziga whether he could provide further corroborating evidence of his claim, or, if he could not, whether he had an explanation for his inability to do so. This error requires remand for a new corroboration determination, *see Toure v. Att'y Gen.*, 443 F.3d 310, 323 (3d Cir. 2006), unless, as the Attorney General argues, "corroboration was not determinative [of] [Luziga's] CAT claim," Respondent's Br. 31.

In her opinion, the IJ held that Luziga failed to carry his burden of proof to demonstrate entitlement to CAT deferral, saying that Luziga had "not met his burden of proof of establishing the elements of his claim." C.A.R. 446. The IJ then pointed to Luziga's failure to provide corroborating evidence, remarking that "[a]s far as Mrisho Nzese is concerned, there is

---

[14] DHS counsel asked several questions about corroboration during proceedings. However, it is the adjudicator's duty to address corroboration by going through the *Abdulai* inquiry if she plans to find corroboration determinative. *See Chukwu*, 484 F.3d at 192.

19

no proof other than one individual so opining, and [Luziga] also opining that he is the nephew of the ex-president[;] [t]here is no *independent corroborative information* supplied on this issue, and that causes the issue to fail under the burden of proof standard." *Id.* (emphasis added). And further, "[w]ith respect to the suggestion that the ex-president would, even if he is related to Mrisho Nzese, do something unlawful to vindicate Mrisho Nzese, is supported by nothing at all on the record other than some opining by this expert . . . and [Luziga]'s own opinions about that." *Id.* The IJ also stated that there was no evidence corroborating Luziga's testimony that his friend shot a bus driver, his stepfather couldn't protect him, and his parents-in-law and Nzese could torture him with the acquiescence of public officials.

The Attorney General argues that, though the IJ discussed corroboration, she ultimately denied Luziga's request for deferral because of his failure to satisfy the "burden of persuasion."[15] The Attorney General asserts that the IJ noted the facts Luziga failed to corroborate, but ultimately accepted those facts for purposes of argument and was nevertheless unpersuaded that Tanzanian officials would acquiesce in Luziga's torture.

We are unconvinced. The IJ emphasized Luziga's failure to corroborate throughout her opinion, and while she indicated that she would assume that Luziga had been threatened and that Nzese is in fact the nephew of the former president, she explained that, even assuming those facts, Luziga had failed to carry his burden of proof on the nexus between the possibility that his feared assailants would torture

---

[15] Oral Argument at 22:40-23:05, *available at* https://www2.ca3.uscourts.gov/oralargument/audio/17-2444AyubJumaLuzigav.AttyGenUSA.mp3.

him and government acquiescence. C.A.R. 447-48 (explaining that CAT relief requires acquiescence of a public official, and deciding "[t]here is absolutely, completely[,] no evidence of this at all"). The rub is that Luziga credibly testified that Tanzanian officials acquiesce in harm perpetrated by people with government connections, particularly when he testified about his friend shooting a bus driver with impunity because his grandfather had been a member of parliament. Moreover, he provided an expert who testified to the same effect based on his study of Tanzanian history and society. *See* C.A.R. 530 ("People with government contacts have the ability, essentially, to enact plans, to enact violence against other individuals if they so choose."). Thus, a failure to prove acquiescence must not have been due to a lack of credible testimony on the issue. And if Luziga's failure on the burden of proof was not due to a lack of credible testimony, the only other possibility is that the IJ found Luziga failed to produce corroborating evidence.

There is nothing inherently wrong with that—IJs may require corroboration of central aspects of a claim that can be easily verified or demand an explanation for the absence of reasonably available corroborating evidence. *Chukwu*, 484 F.3d at 192. In fact, we have observed that we "typically" see the *Abdulai* inquiry "come[] into play" in just this type of situation: where the "petitioner has testified, apparently credibly, about the facts giving rise to [his] claim, but the IJ believes it would be 'reasonable' for [him] to have corroboration of one or more facts, such that [the IJ] imposes an obligation on [him] to produce corroboration in order to meet [his] burden." *Quao Lin Dong*, 638 F.3d at 231. The demand is not the problem; what we prohibit is failing to notify the noncitizen of an unspoken expectation and then penalizing him for failing to meet it. The IJ held Luziga's failure to

produce corroborating evidence against him without first giving him notice and an opportunity to provide the evidence or explain its absence, as *Abdulai* requires. That is precisely the kind of "'gotcha' conclusion[]" that led this Court to vacate and remand in *Saravia*. 905 F.3d at 738-39. Therefore, we must remand for a new corroboration determination.

## IV.

In light of the foregoing errors, we will grant Luziga's petition for review, vacate the underlying order, and remand this case for further proceedings consistent with this opinion.